IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 18-cv-02302-RBJ

ABIGAIL GAIL PADILLA,

     Plaintiff,

v.

STEVEN T. MNUCHIN, Secretary of the Department of the Treasury,

     Defendant.

---

### ORDER ON MOTION FOR SUMMARY JUDGMENT

---

Defendant moves for summary judgment pursuant to Fed. R. Civ. P. 56. Ms. Padilla has responded, ECF No. 62, and defendant has replied, ECF No. 63. For the reasons provided in this order, the motion is granted.

## I. FACTS.

Based on review of the parties' briefs and exhibits, the Court finds that the following facts are either undisputed or have been established as being beyond any genuine dispute.

1.     In 2010 Abigail Gail Padilla, sometimes referred to as Gail Padilla, was hired as an Initial Assistance Representative for the Internal Revenue Service. By 2013 she had been promoted to the position of Individual Taxpayer Associate Specialist ("ITAS"), and she held that position until the termination of her employment effective June 26, 2015.

2.     The essential duties of an ITAS included serving as an advisor to taxpayers in face-to-face meetings; resolving account, payment, filing and notice issues; and working with senior ITAS's.

3.    Ms. Padilla worked at the Taxpayer Assistance Center ("TAC") in Denver.  Her employment was seasonal, keyed to the individual tax filing season, so she typically worked from December or January through May or June.

4.    Three of the employees who worked with Ms. Padilla at the Denver TAC were senior ITAS's: Oather Moore, Carol Walker, and Valarie Robinson.  Each of these individuals served, at various points, as Ms. Padilla's on-the-job instructor.  All three of them are African American.

5.    Ms. Padilla claims that Moore, Walker and Robinson were racist and were hostile to her as well as to other Caucasians and "Spanish" at the office and in applying federal tax laws.  She claims that at various times the three individuals harassed her and assaulted her verbally and even physically.

6.    In late 2013 Ms. Padilla began requesting numerous accommodations for claimed disabilities.  She had been struck by a car in 2002 and suffered a traumatic brain injury.  She also was legally blind in her right eye.  However, Ms. Padilla also (and primarily) claimed that the IRS had caused numerous disabilities, i.e., two specific social phobias, a rotator cuff injury, neck pain, PTSD, depression, psychosis, selective mutism (a condition resulting from stress in which sometimes she could speak and sometimes she could not), tremors, breathing difficulties, scratched sclera, blurred and double visions, and doubled symptoms' side effects from medications (spasmodic side-effects of medication used for IRS-caused occupational diseases).

7.    To a very substantial extent Ms. Padilla attributes the IRS-caused disabilities to stress caused by the conduct of Moore, Walker, Robinson, and the group secretary, Cassandra 'Renee' Evans, who also was African American.  She considers those individuals to be "triggers" for her various conditions, and her requests for accommodations frequently involved her problems interacting with those individuals in

the workplace. Taxpayers could also be "triggers." According to Joanne Turbyne Muñoz, Senior EEO Specialist with Reasonable Accommodation Services for the IRS Disability Office, Ms. Padilla "requested a female 'interpreter/communicator' to handle her interaction with taxpayers that she found to be 'triggers.'" ECF No. 60-2 at ¶16.

8.      In January 2014 Ms. Padilla also began requesting large amounts of medical leave pursuant to the Family Medical Leave Act, often without providing supporting medical documentation.

9.      Also, in January 2014 Ms. Padilla contacted an EEO Counselor at the IRS, for the first time so far as the record before the Court shows. *See* ECF No. 60-18 at 2.

10.      On April 25, 2014 she filed an administrative complaint with the IRS. *Id.* IRS Case 14-0135. She alleged the existence of a hostile working environment based on a co-worker's striking her on her hand and upper arm; a co-worker's yelling at her; and a co-worker's saying that he or she did not want to babysit her. *See* Declaration of Emily Urban, Senior Counsel with the Office of Chief Counsel, Internal Revenue Service. ECF No. 60-17 at 2.[1]

11.      By June 2014 Ms. Padilla had submitted 41 "Reasonable Accommodation Requests" ("RAR's"). The majority of the RAR's consisted of complaints about discriminatory and hostile contact by Moore, Walker, Robinson and Evans; requests for changes in the workplace to deal with the hostile environment created by those individuals; and requests to be moved to locations not near those individuals.

---

[1] According to Ms. Urban, Ms. Padilla ultimately filed four administrative complaints of discrimination with the IRS that progressed to the stage of her requesting a hearing before an EEOC administrative judge: 14-0135 (described in the above paragraph); 14-0659 (concerning her requests for reasonable accommodations)*;* 15-0026 (concerning a midyear review); and 15-1189 (concerning coworkers' mocks, threats, and inappropriate comments). ECF No. 60-17 at 1-2. Later in this order I note that the hearing request on three of the four administrative complaints was revoked by an EEOC administrative judge due to Ms. Padilla's inability to participate.

12.     Ms. Padilla repeatedly stated that her disabilities did not affect her job functions so long as the four individuals did not attack her with abusive outbursts and other misconduct.

13.     In its investigation of Ms. Padilla's administrative complaint concerning her RAR's, the IRS asked Ms. Padilla to provide medical documentation of the nature of her disabilities, the limitations they imposed on her work, and the need for and nature of any accommodations that might permit her to perform her essential job functions.  The documents Ms. Padilla provided were incomplete, disorganized, and often unilaterally redacted by Ms. Padilla.  The medical documentation that was submitted did not, in general, include any recommendations for specific accommodations for her.  An exception is a two-page report from an urgent care clinic, in which a provider recommended, "It will help also if you can transfer to another area away from the commanding officer who is part of the problem."  *See* ECF No. 60-6.

14.     On May 16, 2014 Ms. Padilla received the Commissioner's decision on her first batch of RAR's.  She filed additional RAR's, and on June 14, 2014 the Commissioner completed his review of all 41 RAR's.  Some of Ms. Padilla's requests were granted, including modifications of her work schedule, moving her to a desk farther away from the individuals she perceived as hostile, and providing her with certain documents she requested.  But most of her requests were denied, many of them on the grounds that they were not actually requests for reasonable accommodations of disabilities and were outside the scope of the RAR process.  *See* ECF No. 60-18 at 2-11.

15.     On September 17, 2014 Ms. Padilla filed her second administrative complaint with the IRS.  This one concerned the Commissioner's denial of most of her RAR's, and as I noted *supra* n.1, it was assigned Case No. 14-0659.

16.     Ms. Padilla was recalled to work for the 2015 filing season in November 2014. She reported on November 30, 2014, but the next day she left abruptly at 2:15 p.m. after

reporting that one of her "triggers," i.e., Moore, Walker, or Robinson, had screamed at her. This was not a unique event. Ms. Padilla would often leave work abruptly, reporting symptoms such as hypoxia and tachycardia due to being "triggered," often by actions by Moore, Walker, and Robinson. She had numerous absences.

17.     On February 12, 2015 Ms. Padilla's Territory Manager, Kathryn Lett, sent her a letter stating that she must report to work or provide appropriate documentation as to why she could not; that continued absences could result in removal (termination); and that, while she had provided some documentation excusing individual absences, she had not provided documentation to support the need for continued absences. ECF No. 60-7 (Declaration of Kathryn Lett) at 7.

18.     On March 27, 2015, Ms. Lett informed Ms. Padilla in a letter that she was recommending termination of her employment based on excessive absences between January 12, 2014 and March 21, 2015. ECF No. 60-15 at 1-3. The letter reported that during that period Ms. Padilla had worked only 177.5 hours of approximately 1,384 hours expected; that there was no foreseeable end to the excessive absences; and that her position as a seasonal ITAS required that she be available for duty on a regular full-time basis during her season. *Id.* It reminded Ms. Padilla that she had acknowledged receipt on February 17, 2015 of Ms. Lett's letter of February 12, 2015 in which she was warned that continued absences could result in removal. Ms. Lett added that because of the absences (1) Ms. Padilla was unable to assist customers in a high traffic office; (2) other employees' workloads were increased, (2) the number of taxpayers who could be assisted was decreased, (4) wait times for taxpayers in the Denver TAC were increased; (5) Ms. Padilla's presence at work when she did work was often disruptive to operations; (6) she was unable to work without constant direct supervision; (7) she had not completed her training

and often did not remember how to do the job working with taxpayers; and (8) no alternative to termination would improve the situation in light of past warnings. *Id.* at 3-4.

19. On May 17, 2015 Ms. Padilla filed the first of what would ultimately become five complaints filed with the U.S. Office of Special Counsel ("OSC"), a federal agency created to protect federal employees from certain prohibited personnel practices. In this complaint (MA-15-4036), she claimed, apparently for the first time, to be the victim of retaliation for engaging in whistleblower activities. *See* ECF No. 60-22 at 3.[2]

20. On May 26, 2015 Ms. Padilla filed her second OCS complaint. In this complaint, which was not assigned a number, she accused Moore, Walker, Robinson and Evans of a variety of wrongs including spanking her, striking her, and insulting her kosher food. *Id.* at 6.

21. On May 26, 2015 Ms. Padilla also contacted an EEO official with the Department of the Treasury to initiate the Department's EEO pre-complaint process concerning alleged discrimination based on race, age, sex, and disability, as well as harassment and removal. ECF No. 60-20 at 1.

22. On June 11, 2015 Ms. Padilla filed her third OSC complaint (MA-15-4449), accusing Mr. Moore of retaliation against her for whistleblowing activities and challenging various other personnel actions including denial of leadership and promotion opportunities. ECF No. 60-22 at 4-5.

23. On June 18, 2018 the IRS accepted Ms. Lett's recommendation for Ms. Padilla's removal and made her removal effective on June 26, 2015. ECF No.60- 22 at 5.[3] The letter

_____

[2] ECF No. 60-22 is an "Election of Remedies Order" that was issued by Department of the Treasury Administrative Judge Evan J. Roth on December 7, 2016. I will discuss that order later in this order. Judge Roth made a substantial effort to prepare a chronology of Ms. Padilla's OSC complaints and MSPB appeals, and I have found his order helpful in putting together the chronology in this order.

[3] The IRS sustained eight of the 17 specifications of excessive absences listed in Ms. Lett's letter recommending termination. *Id.* Some or the other specifications apparently were converted from

informed Ms. Padilla that she could appeal to the Merit System Protection Board ("MSPB" or "Board").[4] If she alleged that retaliation for whistleblowing was a basis for her removal, then she could either (a) appeal to the MSPB or (b) file a grievance through the negotiated grievance procedure, or (c) file a complaint seeking corrective action from the OSC with the option of filing an Individual Right of Action ("IRA") appeal to the MSPB if the desired action by the OSC were denied. ECF No. 60-22 at 5.

24.     After her removal Ms. Padilla applied for several other positions within the IRS and the Department of the Treasury but was not offered any of those positions. In her response to the pending motion for summary judgment Ms. Padilla states that she attempted to complain about her non-selection, but a woman named Tonica Pitman told her she was blacklisted. She adds that her "gut instinct" was that Ms. Pitman was like her "triggers," i.e., Moore, Walker, and Robinson, and that "Ms. Pitman refused to accept the EEO complaint because of Ms. Padilla's 'Southern European' race." ECF No. 62 at 13.

25.     On June 23, 2015 Ms. Padilla filed her fourth complaint with the OSC, which was not assigned a number. *See* ECF No. 60-22 at 5. In this complaint she again challenged her removal based on whistleblower reprisal. *See* ECF No. 60-22 at 5-6.

26.     On July 10, 2015 Ms. Padilla filed an appeal with the MSPB, number DE-0752-15-0483-I-1, challenging her removal. Although neither party has placed a copy of Ms. Padilla's appeal document in the record of this case, I find from other documents in the record that the appeal was based on whistleblower reprisal and not on discrimination. For example, in her declaration, Ms. Urban states that Ms. Padilla did not challenge her

---

Absence Without Leave to Leave Without Pay as an accommodation or settlement. *Compare* ECF No. 60-7 at 4, ¶18 *with* ECF No. 62 at 12, ¶12 *and* ECF No. 63 at 5.

[4] The MSPB is "an independent adjudicator of federal employment disputes." *Kloeckner v. Solis,* 568 U.S. 41, 44 (2012).

removal on EEO grounds but instead filed an appeal to the MSPB, DE-0752-15-0483, alleging that she had been wrongfully removed because of her disclosures under the WPA. ECF No. 60-17 at 3. In an order issued by the MSPB on February 8, 2016, which I will discuss later, the Board described the appeal as "challenging her removal and raising various affirmative defenses, including whistleblower reprisal under 5 U.S.C. § 2302(b)(8) and reprisal for engaging in protected activity under several subsections of 5 U.S.C. § 2302(b)(9)." ECF No. 60-21 at 2. Those subsections do not concern discrimination. Finally, as also discussed later in this order, the present posture of the appeal, i.e., an IRA appeal following an OSC complaint, is limited to the whistleblower issue.

      27.     On July 23, 2015 the Department of Treasury's EEO office emailed a notice to Ms. Padilla indicating that because her EEO complaint (of May 26, 2015) had not been resolved at the pre-complaint stage, she could file a formal complaint with the Department of the Treasury within 15 days of receipt of the notice. ECF No. 60-20. It also indicated that if she did not file a complaint within 15 days but filed a complaint later, she should attach an explanation as to why she did not meet the time requirements. It further advised that if she believed she had been discriminated against based on age, she could file a civil action in an appropriate U.S. District Court under the Age Discrimination in Employment Act, provided that she informed the EEOC of her intent to sue at least 30 days in advance of filing suit and within 180 days of the occurrence of the alleged unlawful practice. *Id.* at 1-2. There is no evidence in the record before me that Ms. Padilla pursued any of those options.[5]

---

[5] Ms. Padilla states that she did not receive such a notice. The EEO Counselor certified that it was emailed to her.

28.     On August 3, 2015 Ms. Padilla filed her fifth OSC complaint, challenging wrongs by Moore and Walker and other personnel actions, including her removal.  ECF No. 60-22 at 6-7.  It was not assigned a complaint number.

29.     On September 2, 2015 Administrative Judge Roth issued an "initial decision" dismissing her appeal number DE-0752-15-0483-I-1 without prejudice.[6]  He found that the MSPB did not have jurisdiction because her June 11, 2015 OSC complaint encompassing her removal was pending (as were two other OSC complaints also challenging her removal for whistleblower reprisal), and she therefore needed to exhaust her administrative remedies at the OSC before pursuing an IRA appeal to the MSPB.  *See* ECF No. 60-21 at 3.

30.     Ms. Padilla filed a petition for review of that dismissal with the MSPB on September 16, 2015.

31.     On September 28, 2015, although Ms. Padilla's employment had ended three months earlier, the Treasury Department released its final decision dismissing Ms. Padilla's administrative challenge to the Commissioner's decision on Ms. Padilla's RAR's.  ECF No. 60-18.  In a 22-page order issued by Mariam G. Harvey, Director, Office of Civil Rights and Diversity, the Department found (a) that there was no evidence on which a prima facie case of discrimination in the denial of her RAR's could be established on any of the grounds asserted; (b) that management provided legitimate, nondiscriminatory reasons for its actions; (c) that Ms. Padilla had identified a number of impairments that substantially affected major life activities such as communicating, interacting with others, and working, and would be considered as an individual with a

---

[6] "When a complainant appeals to the MSPB, ... the matter is assigned to an Administrative Judge who takes evidence and eventually makes findings of fact and conclusions of law."  *Butler v. West*, 164 F.3d 634, 640-43 (D.C. Cir. 1999) (citing 5 C.F.R. §§ 1201.41(b), 1201.111).

disability; and (d) that no one had said anything about her ability to perform her duties, so she was a "qualified individual with a disability;" but (e) management did not fail to provide reasonable accommodations in respect to any of the 41 RAR's submitted by Ms. Padilla. *Id.* at 18-22. Ms. Padilla was advised of her right to (a) appeal to the EEOC within 30 days of receipt of the decision; or (b) file a civil action in an appropriate United States District Court within 90 days of receipt of the decision if she did not appeal to the EEOC, or (c) filed a civil action within 90 days from receipt of the EEOC's final decision if she did appeal, or (d) file a civil action within 180 days from the filing of an EEOC appeal if there has been no decision. *Id.* at Bates Nos. USA_0005907-08.

32.     On November 14, 2015 Ms. Padilla filed another MSPB appeal, number DE-1221-16-0081-W-1, based on whistleblower grounds.[7]

33.     On November 25, 2015 the OSC closed Ms. Padilla's original OSC complaint, i.e., the complaint filed May 17, 2015 (MA-4036).

34.     On February 8, 2016 the MSPB reversed Judge Roth's order dismissing MSPB appeal number DE-0752-15-0483-I-1. ECF No. 21. The MSPB found that Ms. Padilla could not have challenged her removal in her June 11, 2015 complaint (or earlier OSC complaints) because she had not yet been removed. The Board was unable to determine on the record before it whether Ms. Padilla had challenged her removal in any of the complaints she had lodged with the OSC after her removal, and it remanded for further proceedings. *Id.*

---

[7] In his later Election of Remedies Order Judge Roth characterized appeal number DE-0752-15-0483-I-1 as the MSPB appeal challenging Ms. Padilla's removal and appeal number DE-1221-16-0081-W-1 as the MSPB appeal challenging adverse personnel actions other than her removal, even though the two appeals relied on largely similar facts and circumstances. ECF No.60-22 at 2. The parties have not informed the Court of the current status of appeal number DE-1221-16-0081-W-1. Judge Roth mentioned that it was pending as of December 7, 2016.

35.     At some point, the date being unknown to me, the Treasury Department determined that the decision on Ms. Padilla's RAR's that it issued September 28, 2015, had been released in error because Ms. Padilla had requested a hearing before an EEOC administrative judge on the her RAR claim (14-0659) as well as the hostile work environment and mid-year performance review administrative claims she had filed with the IRS, 14-0135 and 15-0026.  Urban Decl., ECF No. 60-17, at 2.  I'm not sure what happened to the fourth IRS administrative complaint.  *See supra* at 3 n.1.

36.     However, on August 24, 2016, EEOC Administrative Judge Katherine Kruse revoked Ms. Padilla's hearing requests, finding that Ms. Padilla had a serious mental illness that rendered her unable to attend and participate in a hearing.  ECF No. 60-19.  The Department then re-issued the September 28, 2015 final agency decision, although to the best of my knowledge the date of re-issuance has not been provided to this Court by the parties.

37.     On December 7, 2016 Administrative Judge Roth on remand from the MSPB in DE-0752-15-0483-I-1 issued the Election of Remedies Order.  ECF No. 60-22.  He found that Ms. Padilla had challenged her removal in her fourth OCS claim (June 23, 2015), filed after she had been notified of her removal, and thus she had effectively elected to pursue her remedies initially at the OSC followed by an IRA appeal.  ECF No. 60-22 at 2, 5-6.[8]  However, he also found that Ms. Padilla had not been properly advised of the consequences of the election, so he gave her an opportunity to make a new election, no later than December 14, 2016, between (a) an IRA appeal from the OSC to

---

[8] In the caption of his order Judge Roth labels the appeal as number DE-0752-0483-**B**-1 instead of DE-0752-0483-**I**-1, which had been its number until then.  I do not know why that change in the numbering was made.

the MSPB challenging her removal based on alleged whistleblower retaliation or (b) an adverse action appeal directly to the MSPB. *Id.* at 2. The order explained in detail the nature and procedures for the two options, including the jurisdictional requirements for an IRA appeal. *Id.* at 9-13. He explained that an IRA appeal would focus on whistleblower retaliation, whereas in an adverse action Ms. Padilla could raise various affirmative defenses including discrimination in addition to retaliation. *Id.*

38. On December 8, 2016 Ms. Padilla submitted a document that appeared to elect the IRA appeal. ECF No. 60-23.

39. On December 13, 2016 Judge Roth issued another order asking her to (clearly) elect between an adverse action and an IRA appeal. *See* ECF No. 60-24 at 11. Ms. Padilla again elected the IRA appeal. *Id.*

40. On January 19, 2017 Judge Roth again denied Ms. Padilla's IRA appeal in number DE-0752-0483-B-1 for lack of jurisdiction. He found that Ms. Padilla had failed to establish jurisdiction because she failed to make and exhaust at the OSC a non-frivolous allegation of a protected whistleblower disclosure. ECF No. 60-25.[9] He did find that Ms. Padilla had exhausted four allegedly protected disclosures. He found that she had exhausted the first two of those disclosures in MSPB appeal #DE-1221-16-0081-W-1; the third in appeal #DE-0752-0483-I-1; and the fourth in appeal #DE-0752-0483-B-1. However, he found that none of them, even construed in Ms. Padilla's favor, was a non-frivolous allegation. He found three of the disclosures (numbers one, two and four)

---

[9] A protected disclosure is a disclosure of information the claimant reasonably believes violates any law, rule or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety. 5 U.S.C. § 2302(b)(8).

to be too vague and imprecise to qualify, and the other disclosure to be within the category of an EEO claim rather than a protected whistleblower disclosure. *Id.* at 9-10.[10]

41. His order informed Ms. Padilla that she could petition for review by the MSPB but alerted her that at the time the Board had only one member and could not act on a petition for review until at least one additional member was appointed by the President. *Id.* at 14-15. Alternatively, she could seek review in a federal circuit court. *Id.* at 19-20.

42. On January 23, 2017 Ms. Padilla filed a petition for review by the MSPB. ECF No. 60-26.

43. However, the MSPB has been unable to act on the appeal to this date. The MSPB is comprised of three members, and a quorum is two members. When Ms. Padilla filed her petition for review of Judge Roth's second dismissal order on January 23, 2017 the MSPB still had only one member. According to the MSPB website, the MSPB continued to have only member through February 28, 2020, when that member's term expired, leaving it with no members. The MSPB apparently still had no members as of January 24, 2020. *See* https://federalnewsnetwork.com/workforce/2020/01/lack-of-quorum-hits-3-year-mark-at-mspb-with-no-clear-end-in-sight/. Therefore, her petition for review is still pending until the MSPB can act on it.

---

[10] Ms. Padilla's allegations of protected disclosures in her Amended Complaint in the present case are not particularly clear either. She alleges that she was bullied, presumably by the same African-American senior ITAS's, to "officially rubber stamp W-2 transcripts for illegal immigrants from all over the world, e.g., Kenya." ECF No. 13 at 11, ¶73. And, "Social Security numbers of legitimate Americans were obtained on the black market by identity thieves to work past their green cards' expiration, according to Officer Pabilla's [sic] confidential informant." *Id.* ¶74. But the record contains no evidence that she reported these alleged facts to IRS management and was removed in retaliation for reporting them.

44.     Ms. Padilla filed her Complaint in the present action on September 7, 2018.  ECF No. 1.  She has since filed three amended complaints.  ECF Nos. 5, 10 and 13.  On July 12, 2019 defendant filed a motion to dismiss her whistleblower claim for lack of subject matter jurisdiction.  ECF No. 40.  I denied that motion, ECF No. 61, but in the meantime, defendant had filed the pending motion for summary judgment.

## II.  STANDARD OF REVIEW

**A.  <u>Summary Judgment</u>.**  The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The nonmoving party must "designate specific facts showing that there is a genuine issue for trial."  *Id*. at 324.  A fact is material "if under the substantive law it is essential to the proper disposition of the claim."  *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  The Court will examine the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  *Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

**B.  <u>Pro Se Litigants</u>.**  When a case involves pro se litigants, courts will review their "pleadings and other papers liberally and hold them to a less stringent standard than those drafted by attorneys."  *Trackwell v. U.S. Gov't*, 472 F.3d 1242, 1243 (10th Cir. 2007).  Nevertheless, it is not "the proper function of the district court to assume the role of advocate for the pro se litigant."  *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  A "broad reading" of a pro se

plaintiff's pleadings "does not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based." *Id.* Pro se parties must "follow the same rules of procedure that govern other litigants." *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994) (internal quotation marks and citations omitted).

## ANALYSIS AND CONCLUSIONS

In her most recent Amended Complaint, which is now the operative complaint, Ms. Padilla asserts three claims: (1) violation of § 501 of the Rehabilitation Act, 29 U.S.C. § 791;[11] (2) employment discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, et seq. ("Title VII"); and (3) violation of the Whistleblower Protection Act, 5 U.S.C. § 2302(b) ("WPA"). ECF No. 13 at 3-14. I will address these claims after first briefly discussing the unique system created by Congress for the protection of federal employees.

### A.  The Civil Service Reform Act.

The Civil Service Reform Act of 1978, 5 U.S.C. § 1101 et seq. ("CSRA") "established a comprehensive system for reviewing personnel action taken against federal employees." *United States v. Fausto,* 484 U.S. 439, 455 (1988). Agency actions that are reviewable under this system are removals, suspensions for more than fourteen days, reductions in grade, reductions in pay, and furloughs of thirty days or less. 5 U.S.C. § 7512(1)-(5). If the agency's final action is adverse, the employee may appeal to the MSPB. *See Elgin v. Solis,* 567 U.S. 1, 6 (2012). However, except in cases where the employee has a right to appeal directly to the MSPB, she must seek corrective action from the OSC before seeking corrective action from the Board. 5

---

[11] The printed form used by Ms. Padilla for her Amended Complaint asserts a violation of the Americans with Disabilities Act, as amended, 42 U.S.C. §§ 12101("ADA"). *See* ECF No. 13 at 3. However, § 501 of the Rehabilitation Act "is the exclusive remedy for [a federal employee's] claim of disability discrimination." *Widacak v. Potter,* 81 F. App'x 721, 723 (10th Cir. 2003) (unpublished).

U.S.C. § 1214(a)(3). Judicial review of decisions of the MSPB is in the United States Court of Appeals for the Federal Circuit. 5 U.S.C. § 7703(b)(1).

If, however, the employee claims discrimination in violation of a federal anti-discrimination statute, the CSRA procedure is somewhat different. "When an employee complains of a personnel action serious enough to appeal to the MSPB *and* alleges that the action was based on discrimination, she is said (by pertinent regulation) to have brought a 'mixed case.'" *Kloeckner,* 568 U.S. at 45 (emphasis in original). In mixed cases the employee has several options. She can file her complaint with the agency, and upon receiving a final adverse decision, appeal to the MSPB. Or she can skip the agency complaint and proceed directly to the MSPB. Or she can file her complaint with the agency, and upon receiving a final adverse decision, sue in district court (thus bypassing the MSPB appeal). If she elects either option that culminates in an MSPB decision, she can either seek further administrative review by the EEOC or obtain judicial review of the MSPB decision in district court. *Id.* at 45.

**B. Plaintiff's WPA Claim.**

Removal is an adverse employment action squarely covered by the CSRA. Ms. Padilla challenged her removal in a series of complaints filed with the OSC and in an appeal to the MSPB. Her first post-revocation OSC complaint was filed on June 23, 2015, just five days after the agency's termination decision was made. Despite having done so, Ms. Padilla soon thereafter filed an appeal to the MSPB, number DE-0752-15-0483-I-1. Ms. Padilla asserted that she was removed in retaliation for making disclosures protected by the WPA. Although in the past she had complained of various forms of discrimination, she did not assert discrimination as an additional basis for her challenge to her removal in either the OSC complaints or the MSPB appeal. That is significant, because, as I have noted, that would have put her in the "mixed case" category with a different set of options.

The MSPB appeal went first to Administrative Judge Roth for a potential hearing. However, he found that the MSPB did not yet have jurisdiction because Ms. Padilla had filed an OSC complaint challenging her removal before she filed the MSPB appeal, and it was still pending. He mistakenly cited an OSC complaint that Ms. Padilla had filed before the final decision to remove her had been made by the IRS, which resulted in the Board's remand order.

On remand he found that Ms. Padilla's June 23, 2015 OSC complaint was made after the removal decision and that it constituted an election to pursue the OSC route rather than a direct appeal to the MSPB. However, he also found that Ms. Padilla had not been adequately informed about the difference between the two options, and he gave her another chance to make an election of remedies, this time after explaining the choices and their ramifications to her. She again elected the OSC route.

Ms. Padilla did not obtain relief from the OSC, so the next step was an IRA appeal to the MSPB. The appeal again went first to Administrative Judge Roth, and once again he found that the MSPB did not have jurisdiction – this time because she had not exhausted (in the OSC) even one non-frivolous claim that her removal was motivated by WPA reprisal. Ms. Padilla was advised of her remedies at this stage, and she chose to petition the MSPB for review of Judge Roth's jurisdictional order. For reasons beyond her control, i.e., the bizarre inability of the political process to appoint at least two members to the MSPB for more than three years and counting, Ms. Padilla's petition is stuck in the MSPB at this time. Once the MSPB can act, if its decision is adverse to Ms. Padilla, she will have the right to obtain judicial review in the Federal Circuit.

Ms. Padilla filed at least two other MSPB appeals. As I have mentioned, neither party has informed this Court of the present status of number DE-1221-16-0081-W-1, also based on alleged whistleblower disclosures. Judge Roth mentioned in his Election of Remedies Order that

Ms. Padilla had also filed a "non-selection appeal," number DE-3443-17-099-I-1. ECF No. 22 at 2, n.1. I have no information about the current status of that appeal either. If those appeals are still pending, then they presumably are awaiting action by the MSPB, just as in number DE-0752-15-0483-I-1/ DE-0752-15-0483-B-1

However, one thing is clear. The CSRA preempts free-standing complaints of violation of the WPA. *See, e.g., Steele v. United States,* 19 F. 3d 531, 533 (10th Cir. 1994); *Ryan v. Daley,* 511 F. App'x 687, 690 (10th Cir. 2913) (unpublished). Ms. Padilla's WPA claim in the present case is a free-standing claim in the district court. Accordingly, it is preempted, and this Court lacks subject matter jurisdiction as to it.

### C. **Plaintiff's Rehabilitation Act Claim.**

1. Timeliness.

On September 17, 2014 Ms. Padilla filed an administrative complaint, number 14-0659, about the denial of the majority of her RAR's. While that administrative complaint was pending she requested a hearing by an EEOC administrative judge. The parties have not provided the date, but it had to be before September 28, 2015 when the Department issued its final agency decision on the administrative complaint, because defendant has acknowledged that the final agency decision was erroneously issued while the request for a hearing was pending. When the request for a hearing was revoked on August 24, 2016 due to Ms. Padilla's inability to participate in a hearing, the September 28, 2015 decision was reissued. The exact date of reissuance has not been provided.

In the September 28, 2015 decision Ms. Padilla was notified of her appeal rights. She was informed that she had a right to (1) appeal to the EEOC within 30 days; or (2) to file a civil action in district court within 90 days if she did not appeal to the EEOC; or (3) to file a civil action in district court within 90 days after receipt of the EEOC's final decision on appeal; or (4)

file a civil action in district court within 180 days from the date of filing an EEOC appeal if there has been no final decision by the EEOC. *Id* at Bates USA _00005907-08. The notice appears to be consistent with 42 U.S.C. §2000e-5, incorporated in the Rehabilitation Act by 29 U.S.C. § 794a.

There is no evidence in the record that Ms. Padilla filed an appeal with the EEOC after receiving the September 28, 2015 decision as initially issued or after it was re-issued. If not, then obviously she did not file this civil action within 90 days thereafter. However, defendant does not assert in its motion for summary judgment that the Rehabilitation Act claim, which is based on the denial of her RAR's, was untimely. I will not base my decision on an issue that has not been raised or briefed. I simply note that there appears to be a timeliness issue.

2. Merits.

In order to establish a claim for violation of § 501 of the Rehabilitation Act, a plaintiff "must demonstrate that (1) she is a handicapped person within the meaning of the Act; (2) she is otherwise qualified for the job; and (3) she was discriminated against because of the handicap." *Woodman v. Runyon,* 132 F.3d 1330, (10th Cir. 1997) (citing *Pushkin v. Regents of University of Colorado,* 658 F.2d 1372, 1386-87 (10th Cir. 1981)). Defendant concedes, for present purposes, that Ms. Padilla is a handicapped person. However, it argues that she is not qualified to perform the essential functions of the job. ECF No. 60 at 10.

Whether a person with a disability is qualified is determined by applying a two-part test: "(1) whether the individual can perform the 'essential functions' of the job, and (2) if not, whether a reasonable accommodation would allow the individual to perform those essential job functions." *Brockman v. Wyo. Dep't of Family Serv.,* 342 F.3d 1159, 1168 (10th Cir. 2003). Defendant argues that "Ms. Padilla suffers from psychological and physical ailments that make it

impossible for her to serve as a front-line, in-person customer service representative, no matter what accommodations she might be provided." ECF No. 60 at 10.

In its final agency decision, initially issued on September 28, 2015, the Department of the Treasury determined that Ms. Padilla was a qualified person with a disability. ECF No. 18 at 19. Developments in the four and one-half years since that time have raised questions about the continued viability of that finding. Notably, on August 24, 2016 an EEOC administrative law judge found that Ms. Padilla was seriously mentally ill to the point that she was unable to participate in a hearing. In appearances in my courtroom Ms. Padilla has had significant difficulties communicating, doing so only with the help of an assistant and a machine that converts typed statements to a robotic voice.

I cannot envision how Ms. Padilla could serve as a front-line, in-person customer service representative in 2020, which is what an ITAS does. Nor has she provided any evidence that there is another position within the Department for which she is qualified and that she could perform with a reasonable accommodation. Nevertheless, the Department did find that Ms. Padilla was a qualified person with a disability, and I find that that is sufficient evidence to create a genuine dispute of material fact concerning her qualifications.

I do not, however, find that there is a genuine dispute of material fact as to whether the denial of her RAR's was motivated, in whole or in part, by discrimination because of her handicaps. The Department's final agency decision recites in detail the findings first of the Commissioner and then of the Department's Office of Civil Rights and Diversity on each of Ms. Padilla's 41 RAR's. ECF No. 60-18. Regarding "Disparate Treatment," the Department found,

> The first issue to be decided is whether management was motivated by consideration of Complainant's race, color, national origin, sex, religion, age, or prior protected activity when it denied her RARs. Complainant made vague contentions about bias on some bases by her four co-workers, but she did not explain how they were involved in the decisions on her RARs, and no evidence of any such involvement is in the record. Of more importance, Complainant did not

even contend that the managers or the RAC took any of the alleged bases of discrimination into consideration when making their decisions, and she did not contend that any employees of other protected groups had filed similar RARs and were treated in a more favorable manner. We realize that the use of the RAR process is a form of protected activity, and even though Complainant submitted many RARs, there is nothing in the record to show that the RAC or the managers took any inappropriate actions while continuing to process and make decisions on the requests. *In summary, there is no evidence upon which a prima facie case of discrimination can be established.*

*Id.* (emphasis added).

I find that Ms. Padilla has come forward with no contrary evidence in the present case, i.e., no evidence that the denial of her RAR's was the result of unlawful discrimination of any kind. It does not appear that she contends otherwise.

Of course, the denial of a reasonable request for an accommodation of an employee's disability is itself unlawful. But, having studied the Department's response to each of Ms. Padilla's 41 RAR's, I find that its responses were reasonable, and that Ms. Padilla has come forward with no evidence that creates a genuine dispute about that. Specifically,

- There is no evidence that it was unreasonable for the IRS to decline her requests to move or reassign the senior ITAS's whom Ms. Padilla accused of harassing her. *See* RAR numbers 1,4, 19, 25, 26, 31, 33. Such requests do not appear to fall within the meaning of requests for a reasonable accommodation of a disability. Moreover, the agency investigated and found no evidence that those individuals were harassing her. Nevertheless, it sustained her request to move her to a desk farther away from those individuals.

- The agency approved her requests for leave or time off in 2013 and 2014 (until it ultimately removed her for excessive absences). It denied requests to retroactively grant leave dating back to 2011. *See* RAR number 2. There is no evidence in the record that the denial was unreasonable.

- A request that she not be retaliated against for submitting RAR's is not an RAR. *See* RAR number 3. Moreover, there is no evidence that she was ever retaliated against for submitting an RAR.

- There is no evidence that Ms. Padilla's requests to be reassigned away from the harassing conduct of the "triggers" were unreasonably denied. In fact, even though the agency's investigation found no evidence of harassment by the co-workers, her request to be moved to a workspace away from the alleged harassers was granted. *See* RAR's 5, 8, 13, 21, 24, 29. A related request by Ms. Padilla to move her and a service dog to a specific office that was already set up with specialized equipment to provide remote video service to taxpayers who did not have access to a Taxpayer Assistance Center (and employees servicing those taxpayers), RAR number 34, was unreasonable, but again, she was granted a move to a new workspace.

- Requests to notice the nexus between RAR's and workplace injuries or occupational illnesses were not, in fact, RAR's. *See* RAR numbers 7, 11, 12, 20 and 23.

- Requests for access to documents and explanations related to leave requests were not requests for reasonable accommodation of her disabilities as such. Nevertheless, she was provided the information. *See* RAR numbers 9, 10, 14 and 18.

- Several of her RAR's related to a service animal. Although Ms. Padilla apparently provided no medical evidence that a service animal would be a reasonable accommodation for her disabilities, the agency recognized a request for a service animal as reasonable and granted her request for leave to train a service dog. It denied her requests for the agency to pay for the dog and for vests or other personal items for the dog. The agency was unaware, and this Court is likewise unaware, of any authority requiring the employer to pay these costs. *See* RAR's 14-18.

- A request that she be given a pseudonym to hide her identity from taxpayers who might wish to cause her harm was initially denied because she did not identify any such taxpayers. She then clarified that it wasn't "taxpayers" but was the same senior ITAS's. Obviously, a pseudonym wouldn't hide her identity from them. This RAR was not a legitimate request for an accommodation for her disabilities and, frankly, tends to reflect that Ms. Padilla either did not understand the process. *See* RAR number 27.

- An issue that has come up again in the present lawsuit was the office temperature. In RAR number 28 she requested that the agency set the office temperature at 77 degrees because of her Atrovent medication (she apparently later modified this to at or below 77 degrees). Setting aside that she provided no evidence that Atrovent must be kept in a 77-degree environment (or how that heat would affect other employees), the agency responded that OSHA recommends office temperatures in the range of 68-76 degrees, and the agency complied with that. The initial RAR was unreasonable, and the clarified RAR was moot.

- RAR number 32 requested the appointment of an "interpreter." This would be an individual who would communicate with taxpayers when she was unable to speak due to stress caused by co-workers. She provided no medical documentation that she needed such an accommodation or that it would be an effective accommodation, and therefore, it was denied. I do not find that to be unreasonable. Moreover, I have indicated that Ms. Padilla has had a great deal of difficulty communicating in the courtroom and has had to use a machine that translates typing into words. Her co-workers have never been in the courtroom with her. I absolutely sympathize with her condition. But I can't find it to be unreasonable to deny a request to incur the expense of hiring an additional person to be

available to serve as an "interpreter" at times when Ms. Padilla was experiencing stress, particularly without any supporting medical information.

- A request to have an Initial Assistance Representative screen taxpayers assigned to Ms. Padilla to avoid triggers related to her disability was denied because Ms. Padilla did not identify triggers associated with taxpayers, or how taxpayers could be screened effectively, nor again did she provide any supporting medical information. The denial was not unreasonable. *See* RAR number 35.

- Finally, RAR numbers 36-41 (requesting production of certain emails and passwords to access emails, the full name of a Group manager, pre-paid envelopes, replacement of complicated words in other RAR's, and disallowing certain individuals from handing personal property items to prevent "degradation" of chains of custody were deemed outside the RAR process. I agree.

In sum, having studied the Commissioner's and the Department's Office of Civil Rights and Diversity's responses to Ms. Padilla's numerous RAR's, and the evidence or lack of evidence produced in the present case, I find that Ms. Padilla has not shown that there is a genuine dispute of material fact concerning whether the Department's responses were unreasonable, let alone motivated by discrimination. Accordingly, I conclude as a matter of law that Ms. Padilla's claim under the Rehabilitation Act must be dismissed.

**D.  Plaintiff's Title VII Claim.**

1. Failure to Exhaust.

To begin, Ms. Padilla's claim that her removal was in violation of Title VII appears to be procedurally barred. A Title VII claim must be exhausted at the administrative level before this Court may review it. *See Dossa v. Wynne,* 529 F.3d 911, 913 (10th Cir. 2008). To exhaust a Title VII claim, a federal employee must "either file an EEO complaint with the employing

agency or appeal directly to the MSPB." *Coffman v. Glickman,* 328 F.3d 619, 623 (10th Cir. 2003).

Ms. Padilla did not file a direct appeal to the MSPB concerning alleged discrimination based on her race, national origin, sex, age, or otherwise.[12] As to whether she exhausted her Title VII claim by filing an EEO complaint with the agency, I have found that Ms. Padilla did initiate "the EEO pre-complaint process" on May 26, 2015, alleging discrimination based on race, age, sex, and also claiming that she was harassed and removed (although she had not yet been removed) due to discrimination. *See* ECF No. 60-20. The complaint was not resolved in the agency, and she was notified of her right to file a formal EEO complaint with the agency. She did not do so.

I acknowledge Ms. Padilla's statement in her response to the pending motion that she did not receive the notice (although the notice certifies that it was emailed to her). But even if she did not receive the notice at that time, the notice states that a complainant can still file an EEO complaint with the agency after the deadline expires together with an explanation of why she did not meet the notice requirements, and the Department will evaluate that information when deciding whether to accept the complaint for investigation. *Id.* Ms. Padilla did not submit an EEO complaint to the Department out of time even after the notice was produced in this case.

---

[12] I earlier noted that Administrative Judge Roth indicated in a footnote in his Election of Remedies Order that Ms. Padilla had filed a "non-selection appeal," number DE-3443-17-099-I-1. ECF No. 22 at 2, n.1. If that was a direct appeal to the MSPB from her failure to be selected for other positions within the IRS and the Department of the Treasury following her removal, *see supra* at 7, ¶24, then that appeal might also be held up awaiting MSPB action. The parties have not provided me with any information about the current status of that appeal. If that appeal concerned something else, then suffice it to say that Ms. Padilla has provided no evidence that her non-selection was the result of discrimination. Her assertion in response to the pending motion that she had a gut feeling that Tonica Pitman was biased due to Ms. Padilla's Southern European race is not evidence.

2. <u>Merits</u>.

Title VII claims are proven either with direct evidence of discrimination or through the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Ms. Padilla has provided no direct evidence of discrimination by the IRS or the Department of the Treasury. Under the *McDonnell* framework, she must first establish a prima facie case of discrimination. *Barlow v. C.R. England, Inc.,* 703 F.3d 497, 505 (10th Cir. 2012). Ms. Padilla has alleged that her four African American co-workers, Moore, Walker, Robinson and Evans, harbored racial bias against her based on her being an "American" and "Spanish." I find that those vague and conclusory allegations are not evidence of racial or national origin discrimination by the IRS or the Department of the Treasury. Reading her pleadings very liberally in deference to her pro se status, those allegations could be viewed as prima facie evidence of a hostile work environment.

But even assuming that Ms. Padilla has done enough to meet the prima facie case element, the defendant has clearly articulated a legitimate nondiscriminatory reason for terminating Ms. Padilla's employment, i.e., her excessive absences. The facts concerning her huge numbers of absences during 2014 and the beginning of 2015, and that she was warned that continuation of that pattern could result in removal, and the fact that it continued are undisputed. Although arguably she might have been qualified to do the job, the simple fact is that she was not doing the job. Ms. Padilla has come forward with no evidence showing that the given reason for removal was pretextual. I find that it is beyond any genuine dispute that Ms. Padilla's employment was terminated because of her excessive absences.

Accordingly, on both substantive and procedural grounds, I conclude that her Title VII claim must be dismissed as a matter of law.

**ORDER**

For the foregoing reasons, defendant's motion for summary judgment, ECF No. 60, is GRANTED. This civil action is dismissed with prejudice. As the prevailing party defendant may, if it wishes, file a bill of costs, to be taxed by the Clerk pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

DATED this 13th day of April, 2020.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge